SHOW OF THE MONTH, INC., Plaintiff, *v.* SHUBERT THEATRE CORP. et al., Defendants.

Supreme Court, Special Term, New York County, November 24, 1951.

*Nathan B. Kogan* for plaintiff.

*Klein & Weir* for defendants.

EDER, J. Motion for injunction *pendente lite*. Cross motion to dismiss complaint.

This is a controversy which relates to a musical production entitled " Top Banana ", which, on November 1, 1951, opened at the Winter Garden Theatre in Manhattan, and where it is currently showing.

Plaintiff, Show of the Month, Inc., it is alleged, is a corporation serving 19,000 members by criticizing and selecting plays for their patronage and handling their tickets for such plays as are selected. Its business is dependent on the good will of its members. It is alleged that to maintain such good will plaintiff must supply the tickets it promises to supply.

It is alleged by plaintiff that it determined upon and selected the said musical play " Top Banana " and thereupon proceeded to negotiate to purchase tickets for the play.

According to the moving papers an appointment was sought with the defendant Lee Shubert to discuss arrangements for the purchase and delivery of tickets and thereafter a meeting was had with said defendant at the offices of the defendant, Shubert Theatre Corp. The discussion which ensued, it is said, lasted over one-half hour, at the conclusion of which Mr. Shubert agreed to sell tickets to the plaintiff. That during the course of the conference he, Shubert, telephoned the defendant, Weinstock, in charge of the sales of tickets by the Shubert Theatre Corp. and the theatres owned or controlled by it, of which the Winter Garden Theatre is one, and that he instructed Weinstock to meet plaintiff's attorney, Mr. Kogan, who was representing the plaintiff as its agent in the transaction, and make the necessary agreement for the sale of such tickets.

It is asserted that Shubert also agreed that plaintiff would receive a commission of 5% on all of such purchases, as that was the custom.

Mr. Kogan states that he thereafter had discussions with Weinstock during which they considered the available dates and quantities of tickets to be sold to plaintiff. That some questions arose as to the details of the agreement and a meeting was arranged to meet at Shubert's office; that this was done, Shubert, Weinstock and Kogan being present. Kogan's affidavit states: " All of these questions were resolved and defendant Lee Shubert instructed Mr. Weinstock to proceed to the conclusion of a firm agreement between the parties."

Kogan's affidavit further states that thereafter he had further discussions with Weinstock and thereafter and on September 26, 1951, " a final agreement was concluded " between Weinstock acting for all the defendants and Kogan acting for the plaintiff. This final agreement, he avers, provided as follows:

" Defendants Shubert Theatre Corp., Winter Garden Theatre, Lee Shubert, and Elias Weinstock would set aside for purchase by the plaintiff on or before November 1, 1951, certain tickets of admission to defendant Winter Garden Theatre where the musical play ' Top Banana ' is and will be presented for dates and at prices and locations which were agreed upon. The dates and tickets were:

" Full houses for the evenings of January 16, 17, and 29, 1952. For January 16, 1952, Mr. Weinstock advised me that he had already sold approximately 100 orchestra seats ($6.60 each) to another organization, but that the rest of the full house would be reserved for Show of the Month, Inc.

" Half houses for the evenings of January 21, 25, 1952; February 8, 13, 1952. It was agreed that the words ' half house ' meant 50% of each ticket price classification with locations proceeding from Row A to the last row of the orchestra and of the mezzanine, respectively, included within the full one-half of the theatre either to the right or left of a center line down the entire middle of the theatre.

" Half houses, matinees December 12, 1951, and March 1, 1952.

" The entire mezzanine and balcony for the evening performance of March 8, 1952. The price scale was agreed upon. Commissions of 5% were to be paid to the plaintiff. The agreement provided that the plaintiff would immediately go to the expense of sending an advertisement and a letter to all of its 19,000 subscribers and members soliciting their orders for the purchase of tickets for the dates and at the prices agreed upon and that the tickets were to be picked up and paid for on or before November 1, 1951."

Kogan alleges that plaintiff proceeded to perform the obligations required of it by the agreement and proceeded to solicit orders from its 19,000 subscribers and members for the purchase of tickets. That on October 29, 1951, he personally conferred with defendant Weinstock after hearing that plaintiff had been refused delivery of the tickets and at that time he made a tender to him of $45,147.85 and requested delivery of the tickets as agreed upon, but to no purpose; that he was told that Shubert had decided not to let the plaintiff have any

tickets. That subsequently, a tender was again made and delivery of the tickets was demanded and that defendants' attorney stated that the tender was useless, that no tickets were going to be delivered and that Shubert was adamant and refused to comply with the terms of his agreement.

Kogan's affidavit states that a change of terms was suggested, to which he refused to agree. He states: "I refused to make any novation in the terms of our agreement and pointed out that thousands of orders had been received from members and subscribers of Show of the Month, Inc., for the dates specified in the agreement and that unless such orders were filled, the business of Show of the Month, Inc., was placed in grave jeopardy."

As to the defendants' version: They unequivocally deny all of the material allegations of the complaint; they deny any agreement was made with plaintiff or any option was granted to it for the purchase and sale of tickets. The defendant Lee Shubert, in his opposing affidavit, states that any statement that an agreement was made is not the fact and he also denies all allegations which aver that fraud and deceit were practiced on the plaintiff. His affidavit declares: "I wish to unqualifiedly deny on behalf of all of the defendants, all of the material allegations of the complaint which allege that any option agreement or any agreement was entered into between plaintiff and defendants for the purchase and sale of tickets, and further deny all of the allegations of the complaint which charge the defendants with any fraud or conspiracy to defraud."

He then goes on to say: "I categorically deny that on September 26, 1951, or on any other date ' a final agreement was reached and entered into by and between plaintiff represented by Nathan B. Kogan, Esq.' and the defendants."

Weinstock's affidavit similarly denies the allegations of the moving papers as to any agreement or option regarding the purchase of tickets for the play. As to the claim of a tender he denies it was made, and gives his version as follows: "I deny that Mr. Kogan made a tender to me of $45,147.85, or any other sum. * * *

"As to the alleged tender claimed to have been made by the plaintiff of certified checks, I desire to state the facts as they actually exist.

"In the latter part of September a girl named Daisy, who claimed that she was employed by the plaintiff, left a brief case in my office overnight. The girl made a statement that the brief case contained certain certified checks. She was told by

one of my assistants not to leave any brief case in my office, and that I would not open it. Nevertheless, the girl persisted in leaving the brief case overnight. It was called for the next morning and I understand it is now claimed that this constituted the tender.''

Apparently referring to the second tender claimed by Mr. Kogan to have been made, Weinstock's version is, as follows: '' I do not deny that several times Mr. Kogan stated he had certified checks in his pocket and pointed to his inside pocket indicating that they reposed there, and I have no knowledge whether the checks were actually certified nor the amounts for which they were. I stated to Mr. Kogan that it was entirely premature to consider the subject of certified checks until he had submitted a list of full houses for dates agreeable to the defendants, and I particularly told him that the dates mentioned in his letter of September 26, 1951, were not acceptable.''

Defendants' attorney, Mr. Weir, similarly denies the allegations of Kogan's affidavit so far as they relate to what transpired when he was present. It is diametrically at variance with what Mr. Kogan asserts.

Thus there is presented a situation of word against word, with versions utterly opposed, and wholly irreconcilable. The surprising thing is that in a transaction of the mentioned character, involving such a substantial sum of money, no written contract was drawn and executed. Instead, everything was left to oral understanding.

Of course, if the version given by the defendants is the correct one, then plaintiff has no standing to complain and no right of action.

Was there, in fact, an oral agreement, such as the plaintiff claims, and was there a tender made? These are basal factors of a decisive nature. They involve the element of veracity, a particularly onerous and distasteful task where members of the Bar are concerned.

It is deemed unnecessary to decide where credence should be given in determining the application. Questions of law are raised by the defendants which appear to deny any recovery by plaintiff regardless of any equities which may exist in its favor.

The defendants make the contention that the oral contract upon which plaintiff relies is invalid and unenforcible under the provisions of the Statute of Frauds relating to the sale of goods, which statute is applicable here since it involves a sale of personal property, viz., a sale of tickets. The enactment in concern

is section 85 of the Personal Property Law, which declares: "A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upwards shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf."

The contract in question, assuming it was made, was for a sum in excess of $50 and hence was required to be in writing and it was not. But plaintiff claims it was taken out of the operation of the statute by reason of part performance by plaintiff of the terms of the contract required on its part to be performed.

The performance, or rather, part performance alleged by plaintiff is the sending out of letters of advertisement and solicitations made by plaintiff to its members and subscribers for the purchase of tickets for the mentioned musical.

This doctrine upon which plaintiff depends is without application here and is applicable to contracts for the sale of land. The doctrine has no relation to a sale of personal property. As to a sale of personal property section 85 is clear and specific as to what acts of part performance will render the oral contract enforcible as a valid and subsisting agreement, viz., delivery, or part payment (*De Waal* v. *Jamison*, 176 App. Div. 756, 760, affd. 226 N. Y. 644).

There was here neither delivery nor part payment unless the purported tender constitutes the equivalent of payment and acceptance.

In this connection it is argued by defendants, and, it is felt, correctly so, that the alleged tender does not constitute a payment, for both delivery and payment cannot be made unilaterally but can only be satisfied by tender on one hand, accompanied by an acceptance on the other (*Young* v. *Ingalsbe*, 208 N. Y. 503; *Hawley* v. *Keeler*, 53 N. Y. 114, 119).

Plaintiff, of course, does not contend there was any delivery of goods, i.e., tickets, or any acceptance of the tender. It seems clear, therefore, that the oral contract relied on by plaintiff is invalid and unenforcible.

Plaintiff, however, contends that the option agreement between plaintiff and defendants, though oral, was made mutual and effective by plaintiff's tender, and specific performance thereof may be had. But, as pointed out (*supra*) payment involves

mutuality and cannot be effected by one party alone and that tender alone is insufficient (*Young v. Ingalsbe, supra*).

The complaint, paragraph "6" specifically states that the option relied on by plaintiff was granted pursuant to the final agreement made on September 26, 1951. So far as here pertinent, paragraph "6" alleges, in this regard: "6. On or about the 26th day of September, 1951, at a conference between plaintiff and the named defendants herein, a final agreement was reached *pursuant to which* plaintiff was *granted* an *option* to purchase from defendants Shubert Theatre Corp. and Winter Garden Theatre, certain theatre tickets for specified dates, prices and locations on or before November 1, 1951." (Emphasis mine.)

There can be no doubt, therefore, that the option was born of and dependent upon the validity of the final agreement of September 26, 1951, for its existence. If the contract itself was destitute of legal vitality, the option, as its offspring, was similarly afflicted, and as incurably affected. Both never possessed any legal existence and no valid, enforcible legal obligations or legal rights could accrue or arise or result therefrom (*Dung v. Parker*, 52 N. Y. 494, 496, 498). The option was inseparably interwoven with the contract; if the contract itself was legally incapable of enforcement, for the reasons stated, the option, as a subordinate and subservient element, fell with it; its foundation was the contract; with that gone, it was without any basis for legal support, or continuance.

This premise is advanced by the defendants with respect to the cross motion to dismiss the complaint upon the ground that the causes of action alleged therein are founded on a contract which is unenforcible under the provisions of the Statute of Frauds.

In the situation disclosed it would seem desirable that the parties should come to an amicable adjustment of their differences irrespective of the disposition which is here made of the motion and cross motion and the suggestion is proffered that the parties give due consideration thereto.

However, the instant motions must be disposed of as questions of law and upon the record presented the court is of opinion the complaint does not set forth any maintainable cause of action and that the cross motion to dismiss the same must be granted. It follows, in consequence, that the motion for the injunction must be denied and the temporary injunction contained in the order to show cause, dissolved.

Settle order.